Can we call the University Medical Center of Southern Nevada the hospital for purposes of this appeal? Okay. All right. Mr. Hafter, you have 15 minutes on this one.  May I continue to please the Court? One of the critical questions of this case is whether the Court should be looking at substance over labels. Appellees claim that the action that they took was not a, quote-unquote, adverse action, and therefore, Dr. Tate is not entitled to the due process rights associated therewith. However, when looking at the effects of the appellee's actions, it's clear that Dr. Tate was the victim of an adverse action. The entire basis for how the United States District Court of the District of Nevada derived in previous cases to the decision that a physician's hospital privileges are a constitutional protected property right are based on Roth and Perry. Pardon me, Mr. Hafter. Let's get some facts straight. Sorry. Dr. Tate's hospital privileges were not revoked. True? Are you having some difficulty with that? I am having difficulty with that. Why? I mean, they weren't revoked. He was fired from his job as a trauma surgeon. 30 days' notice, an at-will employment. And what's wrong with that? First of all, he didn't have a 30-day notice. But that's regardless. Second of all, one of the – he had privileges in two departments. One was the Department of Trauma and one was the Department of Surgery. Part of having privileges includes an array of abilities within that department, including admitting patients. By taking him off the schedule, he was precluded from admitting patients to the Department of Trauma. So, therefore, he didn't have the ability to exercise his clinical privileges in their whole, in their entirety. And that's why I say it's form over substance. We have to put the label away and look at the effect of their action. The effect was, was that his clinical privileges were limited. Well, but that's like saying that if you have a contract to do X with a hospital, whatever it might be, and you also have the privilege, you're licensed in effect with the hospital, that one can't, that the license and the right to do X all get mixed up together. And they're two separate things. They just are. There's a separate contract and there's the separate clinical privilege. It's really quite difficult to see why their contract becomes part of his, quote,   can say, well, it's going to be cancelled. And by the way, I didn't notice the arguments made before about the 30 days. I hear it now. No, he never got 30 days. No, I didn't hear the argument about the 30 days before. It wasn't raised. I didn't think it was raised. So let's not talk about the 30-day notice. Let's just pretend that doesn't exist, because it was rotted away. So he got notice that his contract was being cancelled, as the contract said they could do. They could give him notice to cancel the contract. There are questions of fact. And they did. There are questions of fact as to what that contract was, whether it was still valid, because there are. Before we get into that, though, following up on a question, I have noted here that you claim, you said a moment ago, that Dr. Tate was precluded from admitting patients from the trauma department. Yes. Where is that in the record? Kathy Silver was the CEO, and during her deposition, she testified that Dr. Tate was not permitted to admit patients to the Department of Trauma. Give me a record citation, would you please? May I do it during rebuttal, so I don't run out of time? And what does that mean when one talks about admitting patients from the Department of Trauma? Somebody comes into ER or something, I guess, huh? Yeah. You know, I first met Dr. Tate when I was a paramedic. Excuse me? I first met Dr. Tate when I was a paramedic. Is that important? Well, and they opened a new trauma department in the early 90s, and it was like an ER, but it was separate. Okay. So it's an ER department. And he was one of the many trauma surgeons who solely worked in that trauma center. In that ER department. Is that right? Right. And patients that had a mechanism of trauma would be diverted from the regular emergency room into the separate building. Now, if Dr. Husitz, who works in the trauma department, said, you know, this calls for a real expert trauma surgeon that has the talents of Dr. Tate, okay, the person's been in the department, and now they're going to schedule him for surgery. Are you saying that the doctor in that department could not call on Dr. Tate to assist him or to do the surgery? Is that what you're saying? Dr. Tate was precluded from being involved in the Department of Trauma. I didn't ask that question. I suppose it would, because all of his patients were transferred to other patients. All of his patients that he had still pending were transferred to other physicians. He was You said you suppose it would. So if a patient said, nope, you know what, I want Dr. Tate to do my trauma surgery because he's the greatest, he's known as the greatest trauma surgeon in the world. I want him to do my surgery. I want him to do my trauma surgery. The patient says it, and the patient's doctor in the trauma department says it. Are you telling me the hospital will say, no, you can't do it? Is that what you're saying? Well, that never happened. You said you kind of think so, but I'm asking you, asking, is that what the contract and that's what this privileged doctor says? You're asking me to guess, Your Honor. No, I'm not asking you to guess. That's the heart of your case, that he could not practice his, he could not practice in the hospital, in effect, you're saying, if it was a person who had a trauma. Correct, that's our position. He was still at your position, but I was sort of asking you to. That was Dr. Tate's belief, that he could not be involved in the department of trauma. I understand. Counsel, Judge Gould, could you address a point you haven't yet touched on that relates to this? Now, maybe I'm mistaken, so correct me if I am, but I thought that a prior Ninth Circuit panel issued an order, maybe relating to injunction, that said that he got tossed out of the emergency room, but that he did not lose his doctor privileges at the hospital. So am I right about that or wrong? If I'm right that a prior panel said that, then maybe you could address what's the significance of that for us. He did not lose his surgical privileges, so for general surgery. No, that's not the question, Counsel. Judge Gould asked you about a prior Ninth Circuit case. Concentrate on that. Do you agree with the statement of the law as said by Judge Gould? I don't agree with that. What's wrong with what he said? Well, and I guess that's where I was going, and I apologize. My question doesn't start with a yes or no. Did a prior Ninth Circuit panel rule on this? Then you could say what they said and whether you think we're free to disagree with it. The previous Ninth Circuit panel looked at the question on a immunity, and I believe, because I don't have it in front of me, that their response was, yes, he still had his privileges at the hospital. We disagree with that. But the direct quote of our... I don't have it in front of me, I'm sorry. Well, I do. The direct quote, I mean, or part of the direct quote, Here Dr. Chait had only an employment agreement with a hospital to serve as the trauma on-call surgeon. After termination of that employment, he remained able to exercise his clinical privileges in other ways until they were terminated. So he couldn't be the trauma on-call surgeon, we said. We said that he could use his clinical privileges in other ways. Now, that's one reason I was asking you the question before. Being the on-call trauma surgeon is a different animal from being, I should think, from being a trauma, a person who can do trauma surgery in the hospital. And you suggest it's the latter. We said it's the former, it looks like. And I appreciate you providing me that quote, and I'll respond to your question. Document 98-8, or Tate, Excerpt of Record, Version 2, 81 and 82, pages 81 and 82, were where we showed Ms. Silver's testimony at her deposition that addressed this point. And it wasn't whether or not it was solely being on-call, but he still had the ability to exercise trauma privileges. He was not allowed to work in the Department of Trauma as a result of what happened. He still had surgical privileges, general surgical privileges, but general surgical privileges are different, distinct than the Department of Trauma privileges. They're not as broad. They're not extensive. They limit what specific procedures he can do. So he was able to operate. I don't want to deceive the Court. He was able to operate in the hospital, but he was not allowed to do it within the Department of Trauma. He wasn't allowed to do it on trauma patients. He was precluded from being involved in the Department of Trauma. Well, you're saying then a doctor has to have a special trauma privilege, I don't know what they call them, designation separate from surgical privilege. Is that correct? That's correct. He was granted both. So he didn't have the trauma privilege designation, I understand you're saying. All he had was the contract. No, no, no, no. Which does not give this, go through this separate trauma privilege, this separate privilege system. Is that wrong or right? That's incorrect, Your Honor. He had privileges in both departments. He had two sets of privileges. And one defined the privileges that he was able to exercise in the Department of Trauma, and one defined the privileges that he was able to exercise in the General Surgery Department. So the reason we shouldn't follow our prior case that said quite the contrary is because it wasn't understood by that panel respectfully. Okay. So it's because the Ninth Circuit didn't understand what it was doing then,  I believe it begins. Do you have any idea what position that puts us in? I believe that there was an error in the record. I understand. So are we free, counsel, are we free to take a different view and say they were wrong under the law of the case or whatever doctrines would apply to us? Are we free to disagree with the other panel? Well, I would hope that you would disagree with the other panel, especially because that was a preliminary injunction motion. It was an interlocutory appeal. The record was done. Don't go there. Gonzalez v. USA has determined that when we make a determination, at least it's a question of law, an interpretation of a contract is a question of law, that is binding on the Ninth Circuit as law of the circuit and law of the case. And you might be interested to know that our panels in general put a great deal of time into the mere preliminary injunction appeals. Indeed, in some sense, this is almost a preliminary kind of appeal in some funny way. I'm not trying to show any disrespect to the work that was put in. I don't mean that. I'm just trying to say to you that it's hard for us to, say, duck behind the concept that our fellow judges didn't spend enough time in getting there. When there's an error in fact, which is what we believe occurred, you know, I think that that gives you the ability, knowing the way the facts are now, to ----  If there are different facts in the second case from what there were in the first case, that would be a basis. But an error of adjudication of a fact in the first panel, if the record hasn't changed, is binding on us. And I could say I don't know if we had the deposition from Kathy Silver at the time of the ---- So your position is we have different factual basis from the earlier panels. And that consists of ER 281 and 282, the deposition of Kathy Silver. I would believe so. Period. Nothing else. Counsel, counsel, let me tell you what my understanding of the law is, for whatever it's worth. If it's a question of the law of the case, I think we have discretion to make a correction if the first decision was clearly wrong. But it's a tough stand. But we can do that. But if it's the law of the circuit, if, as Judge Baez said, the factual record hasn't changed, then I don't think we can change it. I think it's up to an in-bank court. And I think we're bound by it. The facts that we have here are that he had privileges in two departments, that the privileges in the trauma surgery were separate and distinct from the  And he was not allowed to exercise those privileges. Were they all spelled out in the contract, or is there a separate privilege? It was a separate action. It was the delineation. It was a delineation of privileges when he first started working for UMC. And it's pages. It's in-depth. And that was spelled out. And that's our point in the appeal, is that those privileges from the Department of Trauma, he was not allowed to exercise as they were delineated when they were originally provided because of the way that they acted. Remember, here they sat, the chief of staff and the vice chief of staff sat, secretary of staff, excuse me, sat with the CEO of the hospital and said, how should we respond to this incident? And instead of following the disruptive procedures policy or instead of taking a medical staff action, which would have entitled him to due process, they simply took him off the schedule so that way he was stricken from the Department of Trauma. You're down to just a little over. I'd like to reserve. A little under two minutes, if you care. Thank you. May it please the court. My name is Tom Ryan. I represent the medical and dental staff of the hospital and the individual doctors, Doctors Ellerton, Files, and Bernstein. Ms. Hansen, co-counsel, represents the hospital itself, its board of trustees, and Kathy Silver, the former CEO of the hospital. Two years ago, this court got it right. The statement that has been pointed out by Judge Fernandez still applies, and what we have here in terms of a real gripe is simply that the hospital's termination of an employment contract, the trauma surgery agreement, has cut off his supply of new patients on which he can exercise some of his privileges. It has resulted in the loss of income to Dr. Tate. But the 7th, Collins, the 8th, Engelstadt, the 10th, Steers, the 11th, Voucher Courts, Circuit Courts of Appeal, have held that the loss of income or a particular monetary value associated with fewer opportunities to exercise privileges shouldn't be confused, cannot be confused with the loss of privileges themselves. Okay. You're two sides, a little bit like ships that pass in the night. I understand what we said in our prior decision, but they claim that indeed, taking my hypothetical, if some patient said, I've had a terrible trauma, I want that surgeon to do my trauma surgery, period, I want him to do that trauma surgery, I don't care if he's contracting with a hospital or not. That's the person I want to do my trauma surgery. They say he wouldn't be permitted to do so per silver. You say what? I say that Dr. Ellerton has said he would be permitted to it in a declaration, which is part of the record. Dr. Files has said the same thing in a declaration that is part of the record. It's the supplemental excerpts of record, pages 26 and 27. There are two declarations. Finally, with regard to Ms. Silver, the pertinent record citation is Tate Volume 2, page 86, and it's one of those manuscript deposition transcripts of Ms. Silver, and most particularly I'd point you to page 48 of that deposition transcript. Mr. Hafter asked the question, so can Dr. Tate admit trauma patients? Ms. Silver said if he had a trauma patient that he didn't get from the call schedule, period, he could admit that patient. Question, and how would he be able to do that? Answer, he could have seen a patient that he got months ago from trauma-related injuries that he is seeing in follow-up, and he could admit that patient for whatever he needs to admit that patient for. That's the specific record citation. It's not exactly the way it is argued in the opening brief or the reply brief. I'll acknowledge that. But I think the opening and the reply brief are taking liberties with the precise testimony of Ms. Silver, not to mention overlooking the declarations, which are part of the record from Dr. Ellerton and files. Tate is confusing or conflating the trauma surgery agreement, the employment arrangement that he had with the hospital, not with the medical staff, which is responsible for the conferring of privileges. The trauma surgery agreement was terminable at will. How can there be a reasonable, legitimate expectation of continued employment under the trauma surgery agreement? The district court here also got it right. It says that the trauma surgery agreement may have provided an opportunity to exercise the privilege of admitting a trauma patient, but it did not confer or create the privilege to admit a trauma patient. That clinical privilege exists separate and independent, is distinct from the trauma surgery agreement. And in fact, that's what the Steers court said, which was referred to, cited specifically in the prior panel's decision two years ago, which is kind of why Dr. Tate has morphed into this notion of de facto suspension or has urged this panel to consider the notion of the totality of circumstances. But I really think that there are three levels of fuzzy thinking or blurring here. Number one, the employment contract, the trauma surgery agreement is to be distinguished from privileges. The removal from the call schedule may close a particular avenue for Dr. Tate to exercise his privileges. It may have an effect on the economic value or his income level, but it shouldn't be confused with the privileges themselves, and there are a host of cases that we cited for that proposition. Number two, there's a blurring or a fuzziness with regard to the hospital, UMC, versus the medical staff. Privileges are conferred by the medical staff. The contract here was between the hospital and Dr. Tate. Let's assume that Mr. Hafter and Dr. Tate are correct, that there is some sort of need for a pre-termination hearing before the trauma surgery agreement could be terminated. Well, that hearing, he would argue, had to be conducted under the auspices of the medical staff, under the bylaws. And what was the medical staff to do? They would have a fair hearing, quote, unquote, aimed at what? Overriding, trumping, negating, rewriting the trauma surgery agreement that they made. So that's fuzziness number two. Fuzziness number three is the difference between the trauma surgery agreement versus the bylaws. And I understand that in the briefing, Dr. Tate has moved far away from the trauma surgery agreement. It hardly merits mention in his appellate briefs, and yet it is front and center in his not one, but two affidavits filed in the court below and in his second amended complaint. He says that the trauma surgery agreement laid the foundation for his career at UMC. He said that, pursuant to the terms of the trauma surgery agreement, I acted as an on-call surgeon in the trauma department. Well, okay, let's look at the trauma surgery agreement and let's see that it can be canceled on 30 days' written notice. That's a terminable at-will contract. Again, how can that give rise to a reasonable, legitimate expectation of continued employment that would support an allegation of a constitutional deprivation? It can't. If I can move to my particular clients, the medical staff, there is no argument in the appellate briefs, either in the opening or in the reply, to the effect that the medical staff, an unincorporated association, which Dr. Tate has asserted is independent of the hospital, is somehow liable under the standards of Monell, municipal liability, entity capacity liability. There's nothing in the briefs that even suggest that argument. That argument is limited solely to the hospital. With regard to Drs. Ellerton and Bernstein, as distinguished from Dr. Files, with regard to Ellerton and Bernstein, there are no allegations in the Second Amended Complaint that support any personal participation that is a necessary element of any Section 1983 claim. This is the third iteration of Dr. Tate's complaint. They got it wrong twice before. They still have it wrong. There are only three paragraphs that deal with Dr. Ellerton or Dr. Files, none of which comes close to showing personal participation, which is a necessary element of any 1983 claim. Unless the Court has questions, I think I'll allow Ms. Hanton. Counsel, I have one question for you, if I may please. What's your view of the significance of the prior Ninth Circuit decision? Are we free to take a different view from what they said there? Or are we bound by what they said there? I hadn't really considered the question until you posed it for Mr. Hafter. I think, frankly, that you're probably free to revisit the question, but I think Judge O'Scanlan and Judge Trott got it right. And I think that their guidance, whether or not you have discretion, I think the guidance applies, and it ought to be respectfully considered by this particular panel. Okay. Thank you. Now you've confused me. I thought what you just told me was the facts, the evidence in this case is precisely what they said. In that case, are you telling me something different now? I'm telling you that I probably don't know the answer precisely to Judge Gould's question, and that's all I meant to say. I do think that the earlier decision that came up on an interlocutory appeal from the denial of a preliminary injunction still applies. That earlier observation still applies, period, paragraph. And I think it's a guiding principle, and I think it should be paid attention to here. Whether it constitutes the law of the case, the facts haven't changed, but we are up here from a motion to dismiss. The last time we were here two years ago, I'm trying to think, it was from the denial, obviously, of a motion for a preliminary injunction. I can't remember. I think that the motion to dismiss was granted at the same time that the motion for a preliminary injunction was denied. So that part of the record was established. What happened a little bit later was the remainder of the claims filed by Dr. Tate was the subject of a motion for summary judgment, and that was granted. And you see both of Judge George's orders at the district court in the record at State Volume I. I hope that answers the question. It helps me. All right. I have no further questions. Thank you. I'm sorry, Your Honor? No further questions. I have no further questions. Thank you. Lynn Hansen on behalf of the hospital, the Board of Trustees, and Kathy Silver. I join in all the comments made by my colleague. I think that this case is very clear that the notion of privileges in a contract are distinct and separate. And to answer your question, if a patient would ask for surgery by Dr. Tate or a doctor would ask for his consultation, of course that would occur. If there are no questions, I have no further comments. No questions here. Thank you. Well, Mr. Ryan read Ms. Silver's comments in response to testimony in response to my questions at the deposition. If he would have continued, the question was then placed to Ms. Silver, can Dr. Tate admit new patients to the Department of Trauma? And she said no. It's interesting. There's clearly something that's not gelling, because on one hand we're hearing that he could have admitted, on one hand we're hearing that he couldn't have, he could have, couldn't have. It's not clear. There were questions of fact. Interestingly enough, I had a chance to review the prior panel's decision during Mr. Ryan's comments. The majority of their opinion addressed the issue of mootness in light of the fact that the medical staff later terminated Dr. Tate's privileges, which is the subject of a second case that's still proceeding. And then in the concurring decision, there was discussion about privileges and the like. And so I would think that perhaps this panel could use the fact that the subject matter of the initial opinion was really mootness and that some of those issues that we've discussed haven't been fully vetted. Finally, it's kind of concerning that it was stated that Dr. Ellerton and Dr. Bernstein had no personal action in this case, because we very clearly discussed and the record shows that Ms. Silver and Drs. Bernstein and Ellerton sat together the day after the incident and created a strategy of how they were going to deal with Dr. Tate in response to the incident that occurred. And they decided that they were just going to take him off the schedule. It's the quickest, easiest way. Again, this is an issue of form over substance. And I hope you see that really Dr. Tate was precluded from defending himself at all in this allegation. And it affected his ability to work at UMC and exercise the privileges that he had. So I would hope that you would see that Dr. Tate's rights were indeed violated and allow it to be remanded back for further proceedings. Thank you. Thank you very much. The case of Tate v. University Medical Center of Southern Nevada is submitted. Thank counsel for their argument. And we'll now go to the case of Grand Canyon Trust v. United States Bureau of Reclamation. And each side has 20 minutes of argument. All right. Go ahead. Thank you, Your Honor. May it please the Court. My name is McChristy Adams. I'm here on behalf of the appellant Grand Canyon Trust. This case, as you know, is about the Bureau of Reclamation's application   And I'm here on behalf of the U.S. Department of Justice. And there are four aspects of those operations at issue in this case. Now, two of them, the hourly operations and the daily operations, were approved in the 2009 biological opinion and the 2010 incidental take statement. Yes. I think you've been very candid and we applaud your efforts in determining which issues are moot and which you claim still to survive. So why don't you go directly to the ones that you claim still survive, which I think has to do with a review of the recovered goals and of the operation agreement. I appreciate that, Your Honor. One note I would make about the claims that we agree are moot is that we do request that the portions of the district court's opinions that address the biological opinion and the incidental take statement be vacated. And for the reason that the Federal agencies prevailed below, the actions that have caused these claims to become moot were out of the trust control and the trust has now been prevented from appealing them. All right. Go ahead. Now, the other two aspects of dam operations, as you note, that are at issue in this case are in the annual operating plans. Now, the annual operating plans are subject to the Endangered Species Act and the National Environmental Policy Act because they are discretionary agency decisions that may have impacts on the endangered humpback chub and the other resources of the Grand Canyon. Now, specifically for the Endangered Species Act, the annual operating plans determine the amount of water that will be released over the course of the year and the amount of water that will be released each month. Period? No matter what happens? No matter if we have a thousand-year storm that fills up the thing, no matter if we have a thousand-year drought that eliminates all. There can't be any change in the annual operating plan. There can't be any change in what's done after that. Is that right? There can be one change, Your Honor. The system is built for those sorts of eventualities, the unforeseen. And so there is a provision, and it's noted in the 2008 annual operating plan in the record at 1100, and it's described in more detail at page 898 in the record. And it provides for, based on the April forecast, the agency can go through a similar process that it goes through with the original annual operating plan, seek input from the states, seek input from the other stakeholders, and make that change halfway through the year, if that is appropriate. So, yes, the system is built both for the flexibility of being able to make that change, but that does not undermine the fact that there is a decision made at the beginning of the year. And that decision has consequences, and it has consequences on the endangered humpback chub downstream. Now, reclamation in making that decision is required to use discretion. It's required to weigh numerous factors. Required to use discretion as to what factors? I was under the impression that the only factors that they could use discretion on is dependent on climatological forecasts of how much water there would be. No, that is not correct, Your Honor. All right. You tell me why I was wrong. Well, in the annual operating plan, they actually list the factors, and that's at 1101 in the record. And it states that the annual operating plan was developed with appropriate consideration of the uses of reservoirs.
judges: Fernandez, Gould, Bea